# AFFIDAVIT

I, David S. Philips, a Task Force Officer of the United States Drug Enforcement Administration ("DEA"), having being duly sworn, deposes and states as follows:

1.     I am a narcotics detective with the Richmond Police Department, Richmond, Virginia and serve as a Task Force Officer ("TFO") for the DEA.  I have been a narcotics detective since May 2006 and have been a DEA TFO since May 2016.  As a DEA TFO, I am an officer of the United States who is empowered by law to conduct investigations of, and make arrests for, offenses enumerated in Title 21 and related statutes.

2.     I have been a law enforcement officer with the Richmond Police Department for over 18 years.  During that time, I also served as a TFO for the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  Through my employment with RPD and my service as a TFO for DEA and ATF, I have received specialized training in the area of narcotics trafficking, drug recognition, and telephonic exploitation of drug organizations.  My formal training includes numerous classes and training involving narcotics distribution and searches and seizures of controlled substances, including the 40-hour Top Gun Training at the Marshall-Wythe School of Law and the College of William and Mary.

3.     Through my employment with RPD and my service as a TFO for DEA and ATF, I have participated in investigations into the unlawful possession, possession with the intent to distribute, and distribution of controlled substances, and their associated conspiracies in violation of Title 21, United States Code, Sections 841(a)(1) and 846. I have participated in the preparation and execution of numerous arrest and search warrants for criminal offenses involving the distribution and conspiracy to distribute controlled substances and illegal possession of firearms.  I am familiar with the methods drug traffickers use to conduct their illegal activities, including their

1

communication methods, use of nominees to hide their assets and avoid apprehension, and the acquisition, preparation, packaging, pricing and concealment of narcotics for redistribution.

4.      During my career as a law enforcement officer, I have written over 250 affidavits for search warrants. Many of the searches pursuant to these warrants lead to the prosecution and conviction in both state and federal courts of individuals involved in illegal drug trafficking. I have been involved in the arrests of numerous individuals on illegal drug related crimes, including drug trafficking conspiracies, narcotics distribution and possession with intent to distribute, and simple possession of illegal narcotics. Through these arrests and interviews of many of these individuals, as well as through participation in over one thousand narcotics related operations, I have become knowledgeable in the area of illegal drug trafficking, particularly in and around the Richmond, Virginia metropolitan area. Additionally, I have conducted hundreds of hours of surveillance of illegal drug traffickers, utilized numerous confidential cooperating individuals and various law enforcement databases, conducted numerous controlled purchases of illegal drugs, obtained and executed numerous search warrants, and made numerous arrests, including investigations, searches and arrests involving the unlawful possession, possession with the intent to distribute, distribution and illegal importation of controlled substances, and their associated conspiracies in violation of Title 21, United States Code, Section 841 and 846.

5.      During my employment with RPD, I have testified in court as a fact witness on numerous occasions and have been certified as an expert witness in the field of narcotics in the City of Richmond Circuit Courts and testified on behalf of the Commonwealth on multiple occasions. I have also been certified as an expert witness in the field of narcotics in United States District Court and testified on behalf of the government on several occasions.

2

6.     Your affiant and other law enforcement officers are investigating the illegal manufacture, distribution and possession with intent to distribute controlled substances, including cocaine base, commonly known as "crack," heroin, and fentanyl, by Quotez Tyvick PAIR.  The facts contained in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  Among the witnesses is a confidential source ("CS"), who has provided information to your affiant based on CS's first-hand knowledge and observations.  Information provided by CS has been verified where possible by independent police investigation, physical surveillance, and electronic surveillance and has proved to be reliable.  CS is working with law enforcement in hopes for consideration regarding potential charges and sentences for CS's possession with intent to distribute a Schedule I or II controlled substance.  CS is an admitted drug trafficker and admits to being very familiar with aspects of the illegal drug trafficking trade, including typical distribution and user weights, prices, and appearances of illegal controlled substances including but not limited to powder cocaine, crack cocaine, heroin and illicit fentanyl in the Richmond, Virginia area.  At the direction and under the supervision of law enforcement, this CS has made two controlled drug purchases directly from Quotez Tyvek PAIR.

7.     This affidavit is intended to show merely there is sufficient probable cause for the requested search warrants and does not set forth all of my knowledge or information known to the government about this matter.

## PREMISES TO BE SEARCHED

8.     This affidavit is offered in support of applications for search warrants for the following properties:

3

A.  **1335 Coalter Street, Apartment B, Richmond, Virginia 23223** (the "COALTER STREET APARTMENT"). The COALTER STREET APARTMENT is described as an apartment unit located in the Oliver Hill Crossing apartment complex in the City of Richmond, Virginia. The COALTER STREET APARTMENT is located in a brick apartment building bearing the numbers "1335," which contains multiple individual apartment units. The COALTER STREET APARTMENT is located on the bottom floor of the building marked "1335," on the northwest side of the building. The letter "B" is attached to the door of the COALTER STREET APARTMENT.

B.  **4220 Fayette Circle, Richmond, Virginia 23222** (the "FAYETTE CIRCLE HOUSE"). The FAYETTE CIRCLE HOUSE is located in Henrico County, Virginia. The FAYETTE CIRCLE HOUSE is described as a single family, single-level, ranch-style house, with cream color siding and burgundy shutters. There is an open porch on the right-hand side of the house. There are steps with a white handrail leading onto the porch from the front walkway. The numbers "4220" in white on a black background are attached vertically to a post on the front, right-hand side of the porch and are visible from the street.

## PROBABLE CAUSE

9.      I, along with other law enforcement officers and agents (collectively, "agents"), am conducting a criminal investigation of the unlawful distribution, possession with intent to distribute and conspiracies to distribute and possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 841 and 846 by Quotez Tyvick PAIR and others, known and unknown. In October, 2019, your affiant spoke with CS, who admitted that PAIR had supplied CS with wholesale quantities of heroin on numerous occasions in 2019. CS provided your affiant a cellular telephone number for PAIR. Your affiant determined that Verizon Wireless is the service provider

4

for the cellular telephone number supplied by CS, the number was established on July 11, 2019 and the account has a listed subscriber of "Renada N. Herbert." Independent police investigation, including covert police surveillance by this affiant and other law enforcement personal, confirmed that Renada N. Herbert is PAIR's primary girlfriend and Herbert lives at the FAYETTE CIRCLE HOUSE. Additionally, PAIR admitted to his probation officer that PAIR lives with Herbert, Herbert is PAIR's fiancé, and that Herbert and PAIR have children together.

10.     PAIR has prior felony convictions in state court for maliciously shoot into an occupied building, reduced from attempted murder (2009) and for possession of a firearm by a violent felon (2013). On January 17, 2020, PAIR was charged with two counts of misdemeanor hit and run. Both of those warrants appear to be unexecuted as of today. Records also show that Herbert also was charged on January 17, 2020 with filing a false police report, allegedly arising out of the same incident. That warrant also appears to be unexecuted at this time.

11.     In October 2019, CS and PAIR were together inside the COALTER STREET APARTMENT and PAIR provided CS with a "sample" of heroin for CS to "have tested by a customer." CS immediately contacted your affiant and subsequently gave the purported heroin to agents. This sample of purported heroin was sent to the DEA Mid-Atlantic Regional Laboratory, which determined that the purported heroin was actually 0.485 gram of a mixture and substance containing fentanyl, a Schedule II controlled substance.

12.     In October of 2019, at the direction and under the supervision of law enforcement, CS contacted PAIR on PAIR's cellular number and arranged the purchase of an ounce of heroin from PAIR. This phone call was recorded by law enforcement agents. Agents equipped CS with audio and video equipment and searched the CS and the CS's vehicle with negative results. Agents provided CS with pre-recorded official funds to purchase the prearranged quantity of heroin from

5

PAIR. Agents conducted surveillance of CS as CS proceeded to the COALTER STREET

APARTMENT to meet with PAIR. Inside the COALTER STREET APARTMENT, PAIR

distributed the agreed upon quantity of "heroin" to the CS in exchange for the pre-recorded official

funds. After the transaction, agents observed CS and PAIR walk from the breezeway where the

apartment door is to the sidewalk. CS then returned to the meet location where CS turned over the

suspected "heroin" to agents. CS and CS's vehicle were again searched with negative results.

13.     The purchased purported heroin was sent to the DEA Mid-Atlantic Regional

Laboratory, where it was determined to be 27.69 grams of a mixture and substance containing

fentanyl, a Schedule II controlled substance.

14.     In November 2019, at the request and under the supervision of law enforcement

agents, CS called PAIR on PAIR's cellular number and arranged the purchase of two ounces of

heroin from PAIR. Agents recorded this phone call. Just before the purchase was to occur, agents

searched the CS and the CS's vehicle with negative results. Agents equipped CS with audio and

video recording devices and provided CS with pre-recorded official funds to purchase the

prearranged quantity of heroin from PAIR. Agents conducted surveillance of CS as CS went to

meet with PAIR at the COALTER STREET APARTMENT. Agents watched as CS entered the

apartment. Approximately 13 minutes later, agents observed PAIR exit another apartment across

the street and walk into the COALTER STREET APARTMENT. Inside the COALTER STREET

APARTMENT, PAIR distributed the agreed upon quantity of purported heroin to CS, and in

exchange, CS provided the pre-recorded official funds to PAIR. Agents then observed PAIR and

the CS exit the COALTER STREET APARTMENT. The CS met with the agents and relinquished

custody of the purported heroin. Agents searched the CS and the CS's vehicle again, with negative

results. Agents sent the purchased purported heroin to the DEA Mid-Atlantic Regional Laboratory,

which determined that the purported heroin was actually 55.79 grams of a mixture and substance containing fentanyl, a Schedule II controlled substance.

15.     In late November 2019, approximately one mile from the COALTER STREET APARTMENT, Richmond Police Officers arrested an individual for possession with intent to distribute crack cocaine and found the individual to be in possession of approximately 13 dosage units of suspected crack cocaine and a cell phone. A search of the cell phone revealed a contact entry for "Qutez" and listed the cellular telephone number for PAIR that CS provided to agents and that CS called to arrange the purchases of fentanyl from PAIR.

16.     In December of 2019 and again in January 2020, your affiant obtained a federal search warrant and order allowing law enforcement to monitor the real time location data of PAIR's cellular phone number. Through real-time location data of PAIR's cellular phone number along with physical surveillance, your affiant confirmed that PAIR's primary residence is the FAYETTE CIRCLE HOUSE. Furthermore, since October 2019, through January 4, 2020, your affiant has observed rental vehicles personally rented by PAIR from Hertz Rental Company parked in the immediate vicinity of the FAYETTE CIRCLE HOUSE. On January 2, 2020, your affiant observed PAIR and Herbert exit the FAYETTE CIRCLE HOUSE and enter a car rented by PAIR and leave the area.

17.     Also since October 2019, your affiant and other agents have observed these same rental vehicles personally rented by PAIR from Hertz Rental Company parked in the immediate vicinity of the COALTER STREET APARTMENT.

18.     In January 2020, the CS contacted this affiant and relayed that the CS had just been in the presence of PAIR inside the COALTER STREET, APARTMENT and observed PAIR in possession of ounce quantities of crack cocaine and powder cocaine. CS also observed PAIR with

7

a black handgun in his pants pocket while PAIR was cooking the powder cocaine into crack
cocaine. The CS took a picture of this and sent the picture to your affiant.

19.    On January 21, 2020, the Grand Jury for the Eastern District of Virginia, Richmond
Division, returned an indictment charging PAIR with two counts of distribution of fentanyl.

20.    During the course of this investigation, this affiant and other agents observed Jarratt
Lamar FITZGERALD frequenting the COALTER STREET APARTMENT. According to the CS,
FITZGERALD, a.k.a. "Dooley," is a close associate of PAIR and deals drugs with PAIR.
FITZGERALD's prior criminal history includes a felony aggravated malicious wounding
conviction for which he was sentenced to 20 years of incarceration with 11 years suspended and a
conviction for use of a firearm in commission of a felony for which he was sentenced to 3 years of
incarceration (2008). FITZGERALD currently has a pending felony charge of possession of a
Schedule I or II substance with intent to distribute that is scheduled for trial on March 5, 2020 in
the City of Richmond Circuit Court. On January 21, 2020, law enforcement personnel observed a
2010 black sports utility vehicle bearing 30-day temporary tags 42258X parked in the immediate
area of the FAYETTE CIRCLE HOUSE. This vehicle is registered to a Kendra Antoinette
FITZGERALD, who has an address of 4009 North Avenue, Apartment 7, which is also the address
used by Jarratt Lamar FITZGERALD. Jarratt FITZGERALD is currently wanted for an
outstanding warrant charging failure to report a hit and run arising out of the same incident for
which PAIR and Herbert are wanted.

21.    On January 28, 2020, PAIR's state probation officer went to the FAYETTE CIRCLE
HOUSE to conduct a residence check. There was no answer at the door. The probation officer
attempted to call PAIR but the number dialed did not connect. The probation officer then called
Herbert, who told the probation officer that she was at work. Herbert further stated that PAIR's

8

phone was broken and that Herbert would have to contact PAIR through his friend. Herbert confirmed to the probation officer that Herbert, PAIR and their children still live at the FAYETTE CIRCLE HOUSE.

22.     Also during the course of this investigation, this affiant has confirmed that Yvonne Hicks resides at the COALTER STREET APARTMENT. CS told your affiant that Hicks, also known as "Eazy," allows PAIR and others to distribute narcotics to multiple customers inside her residence in exchange for drugs to use. Hicks has a misdemeanor record that includes a misdemeanor drug related conviction.

23.     On January 21, 2020, CS went into the COALTER STREET APARTMENT and saw "Eazy," an individual known to CS as "Cool-V," and several other individuals who did not live at the COALTER STREET APARTMENT.

24.     On January 22, 2020, CS went into the COALTER STREET APARTMENT and observed "Eazy," who told CS that PAIR had just gotten a new cell phone number, and relayed the number to the CS.   "Eazy" showed the CS an "UZI sub-machine gun with a long clip" that was in a kid's tote book bag in the closet of Eazy's bedroom at the COALTER STREET APARTMENT. The CS stated that "Eazy" "often smokes crack and watches a small TV in this same closet." The CS also stated that "Eazy" told the CS that Quotez (PAIR) and Dookie-Bird each have a handgun stored in a storage container in the rear bedroom of the COALTER STREET APARTMENT. Your affiant is familiar with "Dookie-Bird" and knows him to be Maurice BROWN, a known heroin distributor in the Mosby Court area. This affiant knows that BROWN is a heroin distributor through participation in controlled heroin buys directly from BROWN utilizing a different CS in the past. This affiant also knows that like Quotez PAIR, Maurice BROWN has been a suspect in several shootings in the City of Richmond.

9

25.     Within the last 48 hours, CS was in the COALTER STREET APARTMENT and observed "Cool-V," who CS knows to be a street-level dealer of heroin, sitting at a table in the "dining area" of the COALTER STREET APARTMENT, with a quantity of heroin, and a digital scale and plastic baggies, packaging the heroin for sale.

26.     Through my training and experience, your affiant knows that drug traffickers commonly utilize a residence or place to manufacture, package and sell controlled substances separate and apart from their own residence.  These residences or places are commonly known as "stash houses," and are usually rented or occupied by individuals other than the drug traffickers.  At these stash houses, drug traffickers keep: (a) packaging materials such as plastic sandwich bags and paper folds; (b) cooking utensils such as Pyrex dishes and materials such as baking soda; (c) scales (d) cutting agents; (e) used packaging materials including kilogram wrappers and bags with corners cut out; and (f) firearms.  All of these items are evidence of illegal drug trafficking and drug manufacturing and items designed and intended for use in illegal drug trafficking.

27.     Through my training and experience, your affiant knows that drug traffickers keep items of value, such as illegal drug proceeds, jewelry, and investments, and documents, such as titles to vehicles, indicia of ownership, bank statements, travel documents, owe sheets, electronic storage devices, computers, safes, and lock boxes, all of which are evidence or indicia of unexplained wealth, the laundering of drug proceeds or travel for purposes of drug trafficking.  I also know that drug traffickers often use multiple cellular devices, including telephones and tablets, to conduct their drug trafficking activities and keep items such as contact lists, addresses, shipping information, travel information, photographs of coconspirators and customers, and owe sheets. Drug traffickers safeguard these items from their competition and from law enforcement detection by keeping these items in their residences and away from the stash houses where they could be

10

stolen or seized by law enforcement.  Additionally, armed drug traffickers often store their firearms and indicia of firearm possession, such as ammunition, gun boxes, extra ammunition magazines, and cleaning materials, at their homes to help protect themselves and their proceeds of illegal drug trafficking, and safeguard these items from theft or seizure.  All of these items are evidence and indicia of illegal drug trafficking as well as items used as instrumentalities and the means of committing illegal drug trafficking.

28.     Based on the foregoing, there is probable cause to believe that the items in Attachment B, incorporated by reference herein, are located at the COALTER STREET APARTMENT and the items in Attachment C, incorporated by reference herein, will be located at the FAYETTE CIRCLE HOUSE, all of which items constitute evidence, fruits, instrumentalities and/or fruits of the illegal manufacture of crack cocaine, the possession with intent to distribute crack cocaine, powder cocaine and fentanyl and the distribution of fentanyl, all in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER YOUR AFFIANT SAYETH NOT.


_____
David S. Philips, Task Force Officer
Drug Enforcement Administration

Sworn to and subscribed before me this _____ day of January 2020, in Richmond, Virginia.


_____
          /s/
Roderick C. Young
United States Magistrate Judge


11

/s/
Roderick C. Young
United States Magistrate Judge

Reviewed by Olivia L. Norman, AUSA

ATTACHMENT A

**4220 Fayette Circle, Richmond, Virginia 23222 (the "FAYETTE CIRCLE HOUSE").** The FAYETTE CIRCLE HOUSE is located in Henrico County, Virginia. The FAYETTE CIRCLE HOUSE is described as a single family, single-level, ranch-style house, with cream color siding and burgundy shutters. There is an open porch on the right-hand side of the house. There are steps with a white handrail leading onto the porch from the front walkway. The numbers "4220" in white on a black background are attached vertically to a post on the front, right-hand side of the porch and are visible from the street.

**ATTACHMENT C**
Description of property to be seized

a.  Indicia of occupancy, residency, control and/or ownership of the premises and things described in this warrant, such as utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records;

b.  Drug paraphernalia, including materials for cutting, weighing, and packaging controlled substances;

c.  Personal telephone and address books and listings, letters, telephone bills, photographs, audio and video tapes, digital images, personal digital assistants ("PDAs" or tablets), personal notes and other items reflecting names, addresses, telephone numbers, communications, and/or illegal activities of co-conspirators in narcotics trafficking activities;

d.  Narcotics and money ledgers, narcotics distribution and customer lists, narcotics supplier lists, correspondence, notation logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

e.  Electronic communication devices, cellular telephones, tablets, gaming consoles, two-way radios, and other communication devices which evidence participation in illegal drug trafficking in violation of Title 21, United States Code, Sections 841 and 846;

f.  United States and foreign currency derived from the sale of controlled substances in violation of Title 21, United States Code, Sections 841 and 846;

g.  Bank account records, wire transfer records, bank statements and records, money drafts, letters of credit, safety deposit keys and records, money wrappers, money containers, income tax returns, financial transfers, which reflect payment for or proceeds of the sale of controlled substances in violation of Title 21, United States Code, Sections 841 and 846;

h.  Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, money orders and cashier's checks, passbooks, bank checks, bank deposit tickets, certificates of deposit, and memoranda and other items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money; money counting machines, money wrappers and bags used to carry controlled substances;

i.  Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, businesses, precious metals, jewelry, or other items obtained with the proceeds of the sales of controlled substances;

j.  Records, items, and documents reflecting travel for the purpose of participating in narcotics trafficking, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to locations;

k.  Any and all electronically stored data on computers, hard-drives, zip-drives, or portable storage devices described above in categories (a) through (j), including any and all electronic devices and/or computer hardware equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data, including but not limited to, any data-processing devices (such as central processing units, memory typewriters, internal and peripheral storage devices [such as fixed disks, external hard disk, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, and other memory storage devices]); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communication devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks); computer software consisting of digital information which can be interpreted by computer and any of its related components to direct the way they work including, but not limited to, software stored in electronic, magnetic, optical, or other digital form, which commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communication programs; computer-related documentation consisting of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items; computer passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data consisting of (but not limited to) hardware, software, or other programming code, encryption devices, chips, and circuit boards.

l.  Safes, lockboxes and other portable locked containers.

m.  Firearms, ammunition, and indicia of firearm possession including gun boxes, ammunition magazines, and firearm cleaning materials.